LEIGH M. CLARK, Retired Circuit Judge.
A jury found this appellant guilty on a trial on an indictment that charged him with having “intentionally”,, caused the death of Buford Collins, by shooting him with a shotgun, in violation of “§ 13A-6-2 of the Code of Alabama.” Sub-sections of the cited section of the Alabama Code provide in pertinent part as follows:
“(a) A person commits the crime of murder if:
“(1) with intent to cause the death of another person, he causes the death of that person or of another person;
[[Image here]]
“(b) A person does not commit murder as provided above if he was moved to act by a sudden heat of passion caused by provocation recognized by law, and before there had been a reasonable time for the passion to cool and for reason to reassert itself. The burden of injecting the issue of killing under legal provocation is on the defendant, but this does not shift the burden of proof. This sub-section does not apply to a prosecution for, or preclude a conviction of, manslaughter or other crime.”
*578 Officer Jim Smith, a reserve police officer of the City of Dothan, testified that about 8:40 P.M. on February 17, 1984, he was on patrol with Officer Jeff coat and while riding through a section of the city known as “the Bottom,” a gunshot was heard, they headed the car in which they were traveling in the direction of the gunshot and “stopped about thirty feet south of the Citizens Club ... on the “west side of the street.” His testimony continued as follows:
“O.K. We exited the vehicle. We saw a body lying in the street.
“Q. Now, were there any cars around that body?
“A. Yes, sir. There was a brown station wagon parked on the east side on the — would be the southeast side of the Citizens Club in the parking lot directly in line with the body.
“Q. How far would you say the body was from the brown station wagon?
“A. Probably about thirty or forty feet.
“Q. Was the body in the middle of the street?
“A. Yes, sir, in the middle of the street.
“Q. Did you see this defendant, Willie Gilmore, anywhere?
“A. Yes, sir, I did.
“Q. Where did you see him?
“A. He was sitting in the station wagon.
“Q. Okay. Was there anyone in the station wagon with him?
“A. Yes, sir, there was a black female there.
[[Image here]]
“Q. All right. Did you go to the car where the defendant was?
“A. Yes.
“Q. Could you see in the car when you got to the car?
“A. Yes, sir, we could.
“Q. What did you see in the car?
“A. A double barrel shotgun.
“Q. Where was it lying?
“A. It was lying on the driver’s seat— not the driver’s seat, but the floorboard with the barrel propped up on the transmission hump.
[[Image here]]
“Q. Did you go into the street where the body was?
“A. Yes, sir.
“Q. Did you observe the body you saw on the street?
“A. Yes, sir.
“Q. Now, you have had EMT paramedic training?
“A. Yes, sir.
“Q. Would you describe to the Court and Jury what you observed about that body?
[[Image here]]
“Q. Let me show you State’s Exhibit No. Two for identification purposes and ask you if you would tell me what that is a photograph of.
“A. This would be on the opposite side of the street where you would have been facing the vehicle.
“Q. Does that show the wounded man?
“A. Yes, sir.
“Q. Also shows brain material?
“A. Yes, sir.
“Q. What angle is that photograph taken from?
“A. You would be facing due east here.
“Q. Does that show the top of his head there?
“A. Yes, sir, it does.
[[Image here]]
Another witness who testified on call of the State was Caldonia Teague, who operated a fish house next door to the Citizens Club at the time of the incident involved. His testimony was in pertinent part as follows:
“A. Well, that night I was fixing some fish boxes and I was almost finished with the last one, so I saw Gilmore running— he wasn’t running, but he was walking real fast past my door. So I told my daughter to take this fish and serve it to Larry because he had already paid for it. I was fixing to go see what was going on because my car was out there. So I went to the door and I opened the door *579 and I looked and I saw Gilmore standing at his station wagon with a gun in his hand.
“Q. All right. Did you see Buford Collins anywhere?
“A. Yes.
“Q. Where was he?
“A. Buford Collins come by right after Gilmore did and went over where he was.
“Q. Okay. What happened next?
“A. They was arguing.
“Q. Okay. Now, you are talking about arguing. Are you talking about verbal arguing? They were fussing at each other?
“A. They were fussing at each other.
“Q. Tell us what happened then.
“A. Well, Gilmore told Collins that he would kill him, he hit Collins up side the head and knocked his cap off.
“Q. All right.
“A. Collins reached down and got his cap and put it back on his head and he was laughing. So I said, well, I don’t guess nothing is going on. I went to go back in the place and I got to the first table and I looked back out there and they was tied up on the ground.
“Q. Okay.
“A. I didn’t look to see who was on top or what.
“Q. All right.
“A. I stepped back in there and told my daughter they was fighting out there and I was scared to get in the car to move it.
“Q. Okay.
“A. Then when I went back and looked back out there, they was getting up off the ground and Collins had his back toward the street like he was backing up or trying to back up or something and he had his gun in his hand.
“Q. Who had his gun in his hand?
“A. Gilmore.
“Q. This man right here?
“A. Yes.
“Q. Did he say anything at that time?
“A. Talking about Gilmore?
“Q. Yes.
“A. He was telling Collins he was going to kill him. Collins was asking him not to shoot him. Not to kill him.
“Q. Collins asked him not to shoot him; is that right?
“A. Yes.
“Q. What did you do then?
“A. I went back in there and said he was fixing to shoot him. He is fixing to shoot him. I put my hands up like that and the gun went off.
“A. Yes, I went back out and Collins was laying out in the street.
“Q. Where was Gilmore?
“A. He had got in the station wagon.
“Q. He was in the station wagon at that time?
“A. About that time, the police came up.”
The testimony of Caldonia Teague continued at length on re-re-direct examination and on re-re-cross examination, but we believe we have quoted enough of the testimony of the witness to give the benefit of substantially all of the material testimony of the witness.
The defendant himself testified in detail on direct examination by his attorney and on cross-examination, stating that he came to Dothan from Abbeville, that he first went to a barber shop that Buford Collins, the victim, afterwards entered, that Collins started cursing the defendant, that defendant left the barber shop and went out to the automobile defendant was driving. He testified as follows also:
“Q. Okay, now did Buford Collins come up and say anything to you when you were standing there at the car?
“A. Right.
“Q. What did he say?
“A. I said, man, I don’t know you. Go on and leave me alone. He said again, he said, I’m going to make you know who I is. That’s when he hit me.
[[Image here]]
“Q. Okay. How did he hit you, Willie?
“A. Hit me up side my head.
[[Image here]]
*580 “A. When — when I saw blood on my hand, I got him off of me. When I got him up and got him off and got a shield — got him back like that, that’s when I reached in the car and got the gun. I drawed it back like that (indicating) and hit him with it and it went off.
“Q. Okay. And your hand was bleeding, was that right?
“A. Right.
“Q. Did you see a knife in his hand, Willie?
“A. He had a knife.
[[Image here]]
“Q. That gun — did you shoot him?
“A. No, I didn’t shoot. I hit him with it and it went off.
“Q. Stand up for the jury and show them exactly what you did with that gun.
“A. (Witness indicating.) I had the gun just like holding a baseball bat and hit him and it went off.
“Q. How many times did you swing at him?
“A. About two or three times.
“Q. Did you know that gun was loaded?
“A. No, I didn’t know it was loaded. At the time I didn’t know it was loaded because we had some boys that had been off messing around.”
One of the issues raised on appeal by counsel for appellant is that the trial court erred in denying defendant’s motion for a continuance of the case, which motion was made upon the call of the case for trial and was to the effect that one of the witnesses who had been subpoenaed by defendant for the trial had surprised defendant’s counsel by his attitude as to being willing to testify for defendant. As stated in brief of counsel for appellant, the following is the position taken by appellant’s attorney on the point:
“On the morning of the trial, counsel for appellant were reviewing the testimony with Mr. Poke [the particular witness], and Mr. Poke stated that he didn’t want to testify. He said he ‘didn’t feel like it.’ “Counsel for appellant called Walter Poke to testify even though counsel knew that his testimony would probably be unfruitful. However, this was the only chance we had since the motion to continue the case had been overruled. There was a hope that once he took the stand he might tell what he had told counsel on previous occasions. However, such did not take place....”
The witness, Walter Poke, called by the defendant, was the last witness to testify in the case. We now quote from the beginning of Poke’s testimony on direct examination as follows:
“Q. Where are you now at, Walter? Where are you staying?
“A. I stay in 304 East South Street.
“Q. But you are not there now; right?
“A. No.
“Q. Where are you at now?
“A. Jail.
“Q. Now, you were out there that night in that barber shop, were you not, when Buford Collins came in there and was talking to Willie Gilmore?
“A. Yes, I was there.
“Q. Were you there?
“A. Yes, I was there.
“Q. You heard what was said; is that right?
“A. I heard — I didn’t say but two words.
“Q. Would you tell the Court and Jury what Buford Collins told my client?
“A. Told Gilmore — Gilmore- asked him to go ahead and leave them alone and he said if you — [vulgar words] it. That’s all I heard of it.
“Q. I don’t want to go back over it, but I didn’t really hear it. You said that Gilmore said go ahead and leave me alone?
“A. Right.
“Q. And Collins says—
“A. He said—
“Q. F-U — [last two letters of vulgar word] you.
“A. Collins said — [same vulgar word] it. That was it.
“Q. At what time did anybody leave?
“A. Who?
*581 “Q. Did anybody leave out of the barber shop at that time?
“A. Gilmore and his girl friend.
“Q. They left out?
“A. Yes.
“Q. Did Buford Collins leave out?
“A. I didn’t see him leave out.
“Q. Okay. You know Buford Collins, do you not, Walter?
“A. Yes, I know him.
“Q. How long have you been knowing him?
“A. About six years.
“Q. You all lived pretty close together?
“A. Nope.
“Q. What?
“A. Nope.
“Q. Did you see him down at the Bottom a lot?
“A. I see him off and on.
“Q. Have you ever been drinking with him?
“A. Nope.
“Q. Never have?
“A. I never have drank with him.
“Q. You never have seen him drink anything, is that right?
“A. I seen him. I seen him when he look like he is drinking something.
“Q. When you say look like drinking, what do you mean?
“A. Somebody drinking — somebody— you can tell about the talk or something or another like that.
“Q. You are talking about drinking alcohol now?
“A. Yes.
“Q. You have seen him drinking on several occasions; is that right?
“A. I ain’t seen him drinking. I say he act like he drinking.
“Q. Act like he was drinking?
“A. Yes.
“Q. Act like he was intoxicated?
“A. Right.
[[Image here]]
“A. I have seen him drinking a few times.
“Q. Would that be more than five?
“A. Oh, yes, more than five.
“Q. More than ten?
“A. About six or seven times.
“Q. Six or seven times. You have observed him all these times drinking?
“MR. LITTLE: Is that enough for the Court, Your Honor?
“MR. SORRELLS [District Attorney]: May I ask a question on voir dire?
“THE COURT: Yes.”
For a number of times an attorney for each party took turns in questioning the witness as to what the witness had previously stated to defendant’s attorney within the then last few days while the witness, as well as the defendant, was imprisoned in what all referred to as the “cage.” The testimony was concluded by the following part of further cross-examination of the witness by the District Attorney:
“Q. If somebody’s talking to you in that cage, it’s got wood about half way, has it not?
“A. Right.
“Q. If somebody is talking to you in that cage, they have got to stand on the outside of the cage, don’t they?
“A. Right.
“Q. And if they are talking to you, everybody in that hall can hear it, can’t they?
“A. Right. Right.
“MR. SORRELLS: That’s all.
“THE COURT: You may step down.
“MR. LITTLE: Judge, I’m not going to ask any more questions.
“THE COURT: Mr. Little, who do you call?
“MR. LITTLE: Judge, the defendant rests.
“THE COURT: The defendant has rested. Does the State have anything further?
“MR. SORRELLS: Can I walk out here? The doctor may have gotten here late. Let me check.
“THE COURT: Okay.
“(Brief interruption.)
*582 “MR. SORRELLS: The State rests, Your Honor.
“THE COURT: The State has nothing further.
“Ladies and Gentlemen, I am going to ask you to go with the Bailiff to the Jury Room. I need to go over some instructions with the attorneys before they argue their cases to you. When you come back in here, the attorneys will argue their cases to you.
“You may go to the Jury Room.”
We are not convinced that the trial court was in error in denying defendant’s motion for a continuance of the case. However, we do not question the sincerity of defendant’s counsel in his contention that the attitude of the witness had appeared to defendant’s counsel to have changed at the time counsel talked with him on the day the case was set for trial from what it had been theretofore in talking with defendant’s counsel. Furthermore, we have no reason to believe that the attitude of the witness would have been any more beneficial to defendant at a time to which the case could have been reasonably continued than it was on the day he testified. As shown by the testimony of the witness that we have narrated above, the victim of the alleged wrong had addressed the defendant with insulting language a few moments before the alleged crime was committed and was conducting himself in a way that was calculated to provoke the defendant into the commission of violence against the victim. In other words, the testimony of the witness was beneficial to defendant, even though it was apparently not sufficient to convince the jury that the action of defendant constituted manslaughter instead of murder. No case cited by appellant supports his contention that the trial court committed prejudicial error in denying defendant’s motion for a continuance.
The next issue presented by appellant is thus stated in brief of his counsel:
“Appellant submits that the Court erred in overruling defendant’s objection to the following question propounded to a police officer. ‘Q. Now tell us _ describe where that wound is located and what the pattern of that wound is.’ (R. 63). An objection was made that the police officer was not an expert or properly qualified to answer that question.”
We now quote what the court reporter’s transcript shows at page 63:
“Q. Let me ask you this: Where, now, you observed the wound; is that correct?
“A. Yes.
“Q. Now, tell us — describe where that wound is located and what the pattern of that wound is.
“A. The wound appears to be in the forehead just about the hairline where the hairline would have been. It traveled from front to back.
“MR. LITTLE: Judge, I object, again. The only person that can testify that as an expert is the one who did the autopsy.
“THE COURT: I overrule the objection to that.”
It is to be noted from the above quotation from the transcript that the objection of defendant’s attorney was not made until after the answer of the witness had been given. Furthermore, it is to be observed that in the case relied upon by appellant of Cazalas v. State, 43 Ala.App. 6, 178 So.2d 562, cert. denied, 278 Ala. 708, 178 So.2d 565 (1964), the following was stated at 178 So.2d 564:
“It is true that a witness need not be shown to be a practicing physician before he can express an opinion as to cause of death or as to the manner in which a wound was probably inflicted. Phillips v. State, 248 Ala. 510, 28 So.2d 542; Wallace v. State, 16 Ala.App. 451, 78 So. 714. However, before such an opinion may be expressed by a witness who is not qualified as a medical expert, it must be shown by a preliminary examination of the witness that by study, practice, experience, or observation he has acquired a knowledge of the particular matter beyond that of the average witness or juror.” (Authorities cited.)
In the instant case, the particular police officer testified:
*583 “Q. All right. You say you have been a police officer how long?
“A. Almost twelve years.
“Q. During that time, have you had training in firearms?
“A. Yes, sir, I have.
“Q. Describe for us where and how much training you have had.
“A. Every year we have anywhere from two to four courses of firearms training here in Dothan. We have police pistol range where we usually fire the shotguns. I have had FBI instructions with a pistol and a shotgun. Also, I have talked with a pathologist about the affects [sic] of the shotgun and the science department about the shotgun. We are familiar with the affects [sic] of the shotgun. The blast patterns and—
“Q. You also had training by the FBI?
“A. Yes.
“Q. Let me show you State’s Exhibit Three and State’s Exhibit Two. You took these photographs?
“A. Yes.
“Q. Now, in your-opinion, could these— could that double barrel shotgun that you took in custody that you examined, could it have gone off both barrels accidentally by the force of a blow on the head?
“A. No.
“MR. LITTLE: Judge, I object to that. He is not qualified to answer something like that. Anyway, that is for the Jury to determine.
“MR. SORRELLS: He can give an opinion. He’s qualified to give a layman’s opinion.
“MR. LITTLE: Whether or not he is an expert—
“THE COURT: I think he can give testimony about examining the gun.
“Did you examine the shotgun?
“A. Yes, sir, I did.
“Q. All right. How many triggers are on the shotgun?
“A. It has two.
“Q. Would it fire any other way other than pulling the trigger?
“A. No, not to my knowledge.
“Q. Now, have you done training or have you been experienced with other shotguns with a similar nature?
“A. Yes, many.
“Q. And you say — would just a force from an outside blow, without pressure on the trigger, cause both barrels on a shotgun of that nature and that particular shotgun you examined to go off?
“MR. LITTLE: Judge, I object, again.
“MR. SORRELLS: We would like to try our own case. Either the objection is good or it’s not.
“THE COURT: I sustain the objection.
“Q. Let me ask you this: Well, now, you observed the wound; is that correct?
“A. Yes.
“Q. Now, tell us — describe where that wound is located and what the pattern of that wound is.
“A. The wound appears to be in the forehead just about the hairline where the hairline would have been. It traveled from front to back.
“MR. LITTLE: Judge, I object, again. The only person that can testify that as • an expert is the one who did the autopsy.
“THE COURT: I overrule the objection to that. ,
“Q. That photograph here, you can see where the hole starts right here — is there some powder particles there or— “A. There is powder residue all over the forehead.”
In our opinion, the particular issue now under consideration should be decided adversely to appellant.
The following is the next issue presented by appellant in brief of his counsel:
“Appellant submits that a color photograph of the deceased as it was taken in an unclean condition at the morgue should have been excluded, as it was only introduced to prejudice the minds of the jury. The picture was all so gruesome and was cumulative because other photographs of the deceased had been identified and introduced into evidence (R. 77).” •
*584 The issue pertains to that part of the testimony of Coroner Stokes on direct examination by the State as follows:
“Q. Let me show you what’s been marked State’s Exhibit Five and ask you if you took that photograph?
“A. Yes, sir, I did.
“Q. Does that photograph accurately depict and portray the scene it purports to depict and portray?
“A. Yes, sir.
“Q. Had you cleaned the wound up at that time?
“A. No, sir.
“Q. But you had it in a sterile environment in the hospital; is that correct?
“A. Yes, sir.
“Q. That photograph is an accurate representation of what you observed?
“A. Yes, sir.
“MR. SORRELLS: Move to admit State's Exhibit Number Five.
“MR. LITTLE: Judge, I object on the grounds that this photograph is just like the ones we have admitted before and it’s merely cumulative.
“THE COURT: Let me see it. I’m going to allow it to be admitted.
“MR. LITTLE: Judge, we also object on the grounds it’s a color photograph. It’s too gruesome for the jury to view. The only reason it is used is to prejudice the minds of the jury. We also have some photographs in evidence.
“THE COURT: You have your objection. Overruled.
“MR. SORRELLS: Your witness.”
Counsel for appellant commendably cites authorities of the appellate courts of Alabama to the effect that gruesomeness is not a valid ground for excluding photographs if they have a reasonable tendency to prove or disprove some material fact in issue. The argument in appellant’s brief on the point is completed as follows:
“Three photographs of the deceased taken at the scene had already been identified specifically and introduced into evidence.
“This gruesome color picture was introduced only to inflame the minds of the jury. For the reason stated above, the photograph should not have been allowed in. At some point, the prosecution must be told to stop.”
The writer is convinced that said color photographs taken by Coroner Stokes of the front of the face and head of the victim as his body was lying on its back near what appears to be in the photograph a part of the usual furniture of examination rooms maintained by hospitals and physicians, generally, with the back of the head of the victim lying on a clean white pad. In our opinion, the photograph was such as to enable the jury to obtain a better view of that which was left of the victim’s head after he had been killed from the shotgun in possession of the defendant than the other color pictures that were taken of the body of the victim, including his head, as his body was lying out on the street where he was killed. The trial court was not in error in overruling defendant’s objection to the admission in evidence of State’s Exhibit Number Five.
By the final issue presented in brief of counsel for appellant, the position is taken that the trial court was in error in refusing “the defendant’s written requested charges 10 through 22,” that “they are propositions of law, and should have been given by the trial judge.”
According to what is to be observed from the record proper and the court reporter’s transcript, the jurors were excused to “go home for the night” immediately after the conclusion of the arguments of counsel with the understanding of all concerned that on the following morning when- the jurors returned the trial judge would appropriately charge them and instruct them as to the law and as to their duties as the triers of the fact and then submit the case to the jury for deliberations of its members and the verdict of the jury. The transcript shows that at 9:25 the next morning, the following occurred:
*585 “THE COURT: Let the Record reflect this is out of the presence and hearing of the jury.
“Mr. Little, you indicated to me you wanted to put your objections on the Record; is that correct?
“MR. LITTLE: Yes, sir.
“We accept [sic] to every refusal of defendant’s written requested charges that the Court denied. We accept to [sic] those.
“THE COURT: You have your exceptions and objections for the record. Bring the jury.”
Thereupon, the jury was returned to the courtroom and the trial court delivered a lengthy oral charge to the jury, which included some of the charges requested in writing by the parties, and then sent the jury to the jury room to commence its deliberations. Immediately thereafter, the following occurred:
“THE COURT: Let the Record show this is out of the presence and hearing of the jury, that upon the attorneys’ approaching the Bench, the first time, the State requested further instructions on reckless manslaughter, which the Court gave. Upon approaching, the second time, both sides stated that they had no objection to the Court’s charge or request for further instructions. The only objection being the Court’s failure to give certain requested instructions that the defendant had requested, which previous objections were put on the Record.
“MR. LITTLE: Yes, sir.
“THE COURT: We will be at recess in this case until the Jury returns a verdict.
“RECESS.”
We would be reluctant to hold, because of the fact that the court reporter’s transcript shows the defendant’s attorney as having used the verb “accept” instead of “except,” that the attorney for defendant was not expressing an objection or exception to the action of the trial court in not giving the requested charges; we have had occasion to note from transcripts in the relatively recent past that “accept” was mistakenly typed in the transcript when in fact it was obvious that the person purportedly using the verb was making an objection or taking an exception. Nevertheless, we hold that in expressing an objection or exception to the action of the trial court in refusing to give several charges requested by defendant, such action is not reviewable on appeal for the reason that defendant’s counsel did not state “the grounds of his objection,” as required by the third from the last sentence of Rule 14, Temp. Rules of Criminal Procedure. As Rule 14 from which we have quoted above was adopted June 4, 1982, to be effective July 16, 1982, well before the trial of the instant case, we are not aided by any of the cases cited by either of the parties, as they were tried prior to the adoption or effective date of Rule 14. We find that the third issue presented by appellant is not well taken.
The judgment of the trial court should be affirmed.
The foregoing opinion was prepared by Retired Circuit Judge LEIGH M. CLARK, serving as a judge of this Court under the provisions of § 6.10 of the Judicial Article (Constitutional Amendment No. 328); his opinion is hereby adopted as that of the Court.
AFFIRMED.
All the Judges concur.